<table>
<tr><td>

DISTRICT COURT, COUNTY OF SUMMIT
STATE OF COLORADO
501 N. Park Ave.
Breckenridge, CO 80424
(970) 453-2272

</td><td>

DATE FILED: October 31, 2023 4:09 PM
FILING ID: 3CA171FD8AE2E
CASE NUMBER: 2023CV30135

</td></tr>
</table>

**Plaintiff:**

**Colorado Property Owners for Property Rights,** a Colorado Nonprofit Corporation

v.

**Defendant:**

**Town of Breckenridge, Colorado,** a home rule municipal corporation

▢ COURT USE ONLY ▢

*Attorneys for Plaintiff:*

Jordan C. May, Atty Reg. No. 38734
Ryan P. Horace, Atty. Reg. No. 53091
Frascona, Joiner, Goodman and Greenstein, P.C.
4750 Table Mesa Drive
Boulder, CO 80305-5541
Phone Number: 303-494-3000
Fax #: 303-494-6309
E-mail: jordan@frascona.com; ryan@frascona.com

Timothy J. Knapp, Atty Reg. No. 18867
Knapp & Associates, LLC
11747 W. 54th Pl.
Arvada, CO 80002
Office Number: 720-333-2222
E-mail: tjknapp10@gmail.com

Case Number:

Div. Ctrm:

**COMPLAINT**

Plaintiff Colorado Property Owners for Property Rights ("Plaintiff" or "COPR"), by and through undersigned counsel, submits this Complaint and allege as follows:

**EXHIBIT A-1**

**STATEMENT OF THE CASE**

The Town of Breckenridge ("Town") is a world-class resort community located in Summit County, Colorado, and is one of the top 3 ski and snowboard destinations in North America. The Town's economy is tourist based. Given the high volume of tourist visits to the Town each year, there has historically been strong demand for guest accommodation in the Town. With few hotel accommodations in Breckenridge, the lodging demand has been met in large part with the short-term rental of non-exempt residential properties which exist throughout the Town ("STRs"). The Town categorizes STRs into two separate categories: (i) exempt units providing certain specific 24-hour services; and (ii) non-exempt units ostensibly requiring certain Town services and regulation. This case principally involves challenges to the Town's unlawful regulations and restrictions on STR licenses of non-exempt accommodation units ("STR Licenses").

STRs provide great benefit to the Town. Guest stays in STRs provide various benefits to visitors, including without limitation, a unique experience for visitors who prefer accommodations other than a hotel or lodge. For example, STRs permit large or multigenerational families to reside altogether in a single-family home during their vacation.

Many residents, second homeowners and others constructed or purchased their homes, condominiums, duplexes and other similar properties in the Town with the intention of utilizing their residential property as an STR in a manner compliant with an approved development agreement and/or Town code.

Beginning in  2021, the Town has initiated and adopted a series of ordinances imposing significant restrictions on STR Licenses. The Town's new restrictions include, without limitation, a Town-wide fixed cap of 2,200 STR Licenses, four separate subjectively drawn zones within the Town with 3 of the zones containing a fixed cap of STR Licenses, increased fees for licenses, a prohibition against the transfer of STR Licenses, among other restrictions.

This case arises out of the Town's unlawful actions to limit or otherwise restrict the number of homeowners entitled to receive a STR License within the Town, as well as the districting of STR License zones and creating license caps therein. As Plaintiff will show, the Town's STR Ordinances are intended to suppress the rental market so that local employees can afford housing,

**EXHIBIT A-1**

the Ordinances are preempted by state law, arbitrary and irrational, discriminatory, lacking support from study or data, there is no reasonable relation between the Ordinances and the Town's stated objective of providing employee housing, and ultimately, unlawful. Some of the Town's stated policy goals include reducing the availability and supply of STRs for the specific purpose of increasing the supply (therefore favorably altering the price and affordability) of workforce housing within the Town. Other Town justifications for the Ordinances include reducing perceived negative impacts on certain specific neighborhoods and achieving a "desired reduction" in the number of STRs through attrition and non-renewal. Additional flawed thinking included the feeling by individual Town Councilmembers that 2018 or 2019 levels of STRs felt more sustainable. Unfortunately, the Town chose not to commission an independent study of the issue. Put simply, the Town's Ordinances restrict STRs in a manner violative of the US Constitution, the Colorado Constitution, Colorado's statutory prohibition against rent control and other substantive and procedural rights of owners of residential property within the Town and members of Plaintiff.

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff COPR is a Colorado Nonprofit Corporation with a principal office address of 101 Main Street, C101, Frisco, Colorado 80443.

2. Plaintiff COPR was established pursuant to the Articles of Incorporation, as amended, filed with the Colorado Secretary of State on or about January 20, 2023.

3. COPR was also established to engage in public policy, advocate, protect, and defend individuals' property rights secured by law; educate the public and private parties concerning property rights; advance the shared interests of its members; and use any lawful means to carry out these purposes within the State of Colorado.

4. At the current time COPR has approximately 300 members.

5. Among COPR's members are owners holding interests in residential property within the Town of Breckenridge who have been  injured by the enactment of the Ordinances.

6. Neither COPR nor many of its members have a right to vote on Town issues or elections which deprives them of their procedural rights and protections to which they would otherwise be entitled if they were full-time residents of the Town.

**EXHIBIT A-1**

7. COPR's members who are title holders to (or otherwise hold interests in) residential real property located within the Town of Breckenridge have standing to sue to contest the Ordinances in their own right.

8. The interests COPR seeks to protect in this lawsuit are germane to its purpose.

9. No claim herein asserted or relief requested requires participation of COPR's members in their individual capacity.

10. Defendant the Town of Breckenridge, Colorado is a home rule municipality with a principal office address of 150 Ski Hill Road, PO Box 168, Breckenridge, Colorado, 80424 (the "Town" or "Town of Breckenridge").

11. Pursuant to its Charter, the Breckenridge Town Council is the legislative and governing body of the Town exercising all powers conferred upon or possessed of by the Town and is responsible for adopt such laws, ordinances and resolutions as the Town Council deems proper.

12. This Court has personal jurisdiction over this action as the events in question occurred within Summit County, State of Colorado.

13. This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to C.R.S. § 13-1-124.

14. This is an action, in part, for declaratory judgment pursuant to C.R.C.P. 57 and C.R.S. § 13-51-105.

15. Venue is appropriate before this Court pursuant to C.R.C.P. 98 because the real property at issue is in Summit County.

## FACTS

16. The Town of Breckenridge is a world-class resort community located in Summit County, Colorado.

17. Over the past 5 years, the Town has promoted and marketed itself as a top ski and snowboarding winter vacation destination.

18. The Town's economy is tourist-based.

**EXHIBIT A-1**

19.  The Town experiences a high volume of tourist visits each year.

20. There has historically been strong demand for guest accommodations in the Town, including visitor stays in hotels, condominiums, lodges and STRs, among other accommodations.

21. According to the Town's most recent Comprehensive Plan (2008), "lodging [short term rentals] represents the largest economic sector, followed by retail, restaurants and grocery -liquor." Town of Breckenridge Comprehensive Plan ("Comprehensive Plan"), p. 19.

22. In the Comprehensive Plan, the Town recognized the annual increase of transient travelers that required short term lodging and "day-skiers" that would leave the Town after visiting for the day.

23. One of the Town's stated goals in the Comprehensive Plan is to develop and implement strategies that attract destination visitors and encourage day-skiers to spend time in the community (Breckenridge) after skiing and increase the number of Colorado skiers using overnight accommodations. Comprehensive Plan, p. 24.

24. As noted in the Town's Comprehensive Plan, "[w]hile the short-term renting of second homes may affect the local housing market, it should be remembered that the second homes provide lodging for the very important tourism segment of our economy." *Id.*

25. The strong demand for guest accommodation has been met, in large part, with the STRs within the Town.

26. STRs within the Town have historically provided great benefit to the Town and to visitors to the Town and areas beyond.

27. According to the Town's current Destination Management Plan (2019) the Town's number one goal is to collaborate with the  Breckenridge Tourism Office to "protect the year-round economy… and increase out of state overnight visitations in order to provide a more consistent and lucrative economic pipeline for local businesses and workforce." p. 117.

28. Furthermore,  the Town acknowledged that it needed "deeper research data showing [the] impact of [the]short-term rental market." Destination Management Plan, p. 21.

**EXHIBIT A-1**

29. Guest stays in STRs provide various benefits to visitors, including without limitation, a different experience for visitors who prefer accommodations other than a hotel or lodge.

30. Many visitors to the Town include larger multigenerational families wishing to stay together in a single location like a single-family home.

31. Many residents, second homeowners and others have purchased homes in the Town with the intention of utilizing their residential property as a STR in a manner compliant with the Town code.

32. Residents, second homeowners and members of COPR have invested heavily in residential real estate in the Town, many with the expectation of obtaining an STR license and operating a STR.

33. Town STR ordinances have historically required property owners wishing to operate a STR obtain a license and abide by certain other requirements of the Town code.

34. Prior to September 28, 2021, the Town has never before imposed a Town-wide fixed cap on STR licenses.

35. However, since September of 2021, the Town has enacted a series of ordinances imposing significant restrictions on STRs.

36. On September 28, 2021, Town Council adopted Ordinance No. 29 with an effective date of November 2, 2021. ("Ordinance 29")  In part, Ordinance 29 restricts the number of STR Licenses in the Town of Breckenridge to 2,200.

37. Then on August 23, 2022, Town Council adopted Ordinance No. 28 with an effective date of September 27, 2022.  Ordinance 28 districts the Town into 4 zones and sets STR caps within each zone. (Collectively, Ordinances 29 and 28 are referred to herein as the "Ordinances").

38. Before the adoption of the Ordinances, the Town's regulation of the business of operating a STR required an annual license as provided in Breckenridge Town Code § 4-1-3.

**EXHIBIT A-1**

**Defendant's Ordinance 29 (2021)**

39. Ordinance 29 observes: "[h]istorically, the long-term rental of residential property, or at least the long-term rental of space within a residential property, has been an important means for providing workforce housing within the Town."

40. Ordinance 29 also states as a recital: "[t]o allow for a sufficient number of employees to be hired to provide the services necessary to sustain a tourist-based economy there must be an adequate supply of workforce housing."

41. Ordinance 29 also states as a recital: "[a]t least partially due to the conversion of long-term rental properties into nonexempt accommodation units the Town is currently experiencing a serious and disturbing reduction in the availability of workforce housing."

42. According to the findings in Ordinance 29, from 2012 through 2021, the number of accommodation unit licenses issued by the Town (including both exempt and non-exempt STRs) was:

|      |                                |
|------|--------------------------------|
| 2012 | 2,881 licenses                 |
| 2013 | 2,911 licenses                 |
| 2014 | 3,341 licenses                 |
| 2015 | 3,385 licenses                 |
| 2016 | 3,388 licenses                 |
| 2017 | 3,572 licenses                 |
| 2018 | 3,737 licenses (4.6% increase) |
| 2019 | 3,783 licenses (1.2% increase) |
| 2020 | 3,762 licenses (0.5% decrease) |
| 2021 | 3,945 licenses (4.8% increase)[1] |

43. As of August 16, 2021, of the 3,945 total accommodation unit licenses issued within the Town, 2,476 are nonexempt accommodation unit licenses and hold STR Licenses.

44. On information and belief, the Town Council did not desegregate or separately analyze exempt and non-exempt STR licenses in the deliberation of Ordinance 29.

---

[1] This data is inclusive of exempt and non-exempt STR licenses.

**EXHIBIT A-1**

45. Increases in STR licenses (exempt and non-exempt) averaged approximately 2.525% since 2018 through 2021.

46. Ordinance 29 sets forth findings organized in alphabetical order "A" through "T" (the "Findings").

47. In Ordinance 29, the Town attributed two primary negative impacts from existing STR Licenses:

    a. Reduction in the availability workforce housing;

    b. Change in character of the Town; and

    c. Problems with the Operation of Some Accommodation Units

48. On September 28, 2021, the Town enacted Ordinance 29 with an effective date of November 2, 2021.

49. Ordinance 29 amended the Breckenridge Town Code to, among other things:

    a. Make all STR Licenses nontransferable (subject to the exceptions enumerated in § 4-1-8-1(H)); and

    b. Limit on the number of STR Licenses to a maximum of 2,200.

50. On information and belief, the Town did not commission an independent study, nor did it hire an independent consultant to opine on the impacts the proposed regulations might have on STRs and long-term employee housing in the preparation, consideration or deliberation of Ordinance 29.

51. During a Town Council meeting that occurred prior to deliberations regarding a cap on the number of STR Licenses, Councilmember and Mayor Pro Tem, Kelly Owens, publicly stated, the number of STR licenses should be capped at 2,200 STR Licenses, which is the number of STR licenses she incorrectly believed to exist in the Town during the 2018/2019 period and that she felt created a comfortable community.[2]

---

[2] According to the Town's records there were approximately 3,500 short-term rental licenses (both exempt and non-exempt) in 2018 and approximately 3,700 short-term rental licenses (exempt and non-exempt) in 2019.

**EXHIBIT A-1**

52. According to Town Council minutes, the desire to cap the number of STR Licenses at 2,200 was based on a "comfort level" and a subjective "feel" of the Town during the 2018/2019 period.

53. The Town has repeatedly found, including in its deliberation of Ordinances 29, that STRs provide great benefit to the Town.

**Task Force**

54. In part, because of negative feedback from the community concerning Ordinance 29 (2021), the Breckenridge Town Council created and commissioned a Tourism Overlay District Task Force ("Task Force") in November 2021, to review the Town's land use districts ("LUDs") and the location of current STRs and to develop a recommendation identifying a Tourism Overlay District, an area where some level of new STR licensing would be expected and could continue in the future.

55. Within the LUD Map there are approximately 57 individual Land Use Districts. Each Land Use District contains a corresponding Land Use Guideline (LUG). The LUGs are intended to function as the means to direct the physical, social and economic development in Breckenridge (Town of Breckenridge, People's Ordinance No. 3, Series 1987).

56. Within each LUG are sections titled "Desired Character and Function" as well as the recommended "Acceptable Land Uses and Intensities." The description in each section is intended to be a partial guide of the type of development to be constructed.

57.  The LUDs are one part of three different documents Town officials are to use when reviewing a development. The other two documents include the Town's Comprehensive Plan and the Development Code. (Breckenridge Land Use Guidelines, Introduction)

58. Taken in their entirety, the LUD, LUG, Comprehensive Plan and Development Code represent a framework for how areas of land in the Town were and are to be developed. These documents include design and physical form details: building heights, density, and other physical features that will make the development compatible with the Town's Comprehensive Plan and adjacent developments.

59. The stated planning and development documents were created solely for the purpose of ensuring conformity with whether the property should be used in a commercial, industrial

**EXHIBIT A-1**

or residential manner, as well as to ensure the development meets aesthetic compliance and the aspirations of the Comprehensive Plan.

60. Neither the LUD nor the LUG were developed for the purpose of determining whether the properties were to be utilized for STR uses. Further, numerous LUDs and their corresponding LUGs were overlayed on developments after they were annexed into the Town. In many of these instances, the annexed developments do not conform with their overlayed LUD or LUG.

61. A number of subdivisions within the Town were constructed under a development agreement whereby the intended use of the properties was to be a second home utilized in some fashion as a STR. This occurs despite the subdivision being located in a LUD and containing a LUG that does not specifically acknowledge this intended and acceptable use.

62. The Town acknowledged, and in some instances approved and supported, the use of development agreements whereby a homeowner would pay either the Town or Vail Resorts to create greater access for their subdivision to ski lift facilities, including ski runs and lift chairs, to create in part, a more enticing experience for the short-term guests.

63. These agreements occurred despite having no such language in the subdivisions corresponding LUG.

64. Many of the property owners within these subdivisions are COPR members.

65. Despite their large financial commitment and earlier agreements to secure close proximity and accessibility to the ski facilities, many of these subdivisions that once were intended to be used for STR uses are now located in STR Zone 3 where it is expected to take in excess of 30 years before a STR license will become available.[3]

66. Put simply, properties within subdivisions that were originally planned and constructed to house tourists and transient visitors are now barred from using their property for this purpose since the passage of Ordinance 28.

67. The Town Council directed that the Task Force review the LUDs in proposing areas within the Town for the restriction and growth of STRs.

---

[3] Information provided by the Town's Accommodations Compliance Administrator, Bela Del Valle.

**EXHIBIT A-1**

68. At the onset of their first meeting, the Mayor of Breckenridge provided general instructions to the Task Force which was to recommend what the Task Force thought should be the upper limit for the number of STR Licenses in the Town and to determine where these licenses should be located.

69. The Town also directed the Task Force to consider areas of the Town in which the STR Licenses could be increased.

70. At no time during the period that the Task Force met were they asked to analyze data or determine the number of STR units needed to be converted in order to accommodate local employee housing needs. To the contrary, members of the Task Force did ask Town staff for all studies that correlated these two agendas, but were told that none existed.

71. The evidence will show that during conversations among Task Force members about their proposed recommendations, Town Community Development Manager, Mark Truckey informed the Task Force that the Town Council would not accept a recommendation of a STR License cap that exceeded the cap of 2,200 created in Ordinance 29, and that there was no need for further discussion or study of that issue.

72. Several Task Force members reiterated to Mr. Truckey their concern and conclusion that the cap of 2,200 STR Licenses was insufficient, and that the LUDs and LUG's was an improper mechanism to evaluate where STRs should be located within the Town.

73. Objecting to use the Town's LUDs/LUGs and restrictions on not being able to freely determine the number of STR Licenses required to support the Task Force's research, they proceeded to determine the current number of properties in each of the town's subdivisions that could be short-term rented, how many held a STR license, decided whether-in the opinion and professional experience of the Task Force members-the neighborhood was one that STR licenses should be concentrated.

74. Upon completing this work, the Task Force prepared a map of its recommendation revealing zones where it believed the concentrations of STR licenses should be located, as well as their recommended corresponding STR license numbers.

75. The Task Force met at least six times between November 2021 and February of 2022.

**EXHIBIT A-1**

76. On April 19, 2022, under protest by numerous members of the Task Force for being restrained in their assignment and that their opinion on the number of STR Licenses should exceed 2,200, the Community Development Director issued a memorandum to the Town Council which included a map that the Task Force's had prepared containing zones where it believed should receive concentrations of STR Licenses.  The Director's memorandum did not reflect the actual number of STR Licenses within each zone that the majority of Taks Force members believed should be included, instead, the Director memorandum presented values based on an overall cap of 2,200 STR Licenses. Only Zones 1, 2, and 3 are subject to the 2,200 STR License cap.

77. The Task Force's recommendation included establishing three separate zones, including a Zone 1 – Tourism Overlay Area, Zone 2- Downtown and Upper Warrior's Mark and Zone 3- Outlying Areas.

78. The LUDs played no role in the recommendation as they were unhelpful and do not accurately describe the character or physical improvements contained in each of them, in the opinion of the Task Forces.

79. Several members of the Task Force concluded that the Town's approach to regulating STRs was backwards in that the Town should first look to existing uses of properties, the character and areas within the Town with existing STRs to decide on appropriate STR regulations governing each area within the Town instead of first imposing a fixed Town-wide cap and allocating STR Licenses to certain areas under the predetermined cap.

**Defendant's Ordinance 28 (2022)**

80. On August 23, 2022, the Town of Breckenridge, Colorado, enacted Ordinance 28 (2022), effective on September 27, 2022, repealing and replacing certain regulations applicable to STR Licenses.

81. In considering the recommendations provided by the Town's Task Force, the Town Council rejected the Task Force's opinion that the LUDs and LUGs were inappropriate tools to use to evaluate where the concentration of STR licenses should be located and elected to revisit for themself the LUDs and LUGs.

**EXHIBIT A-1**

82. In addition, Town Council rejected the map recommended by the Task Force that contained the prioritized short-term rental zones and the number of STR Licenses for each.

83. Town Council, without the support of either a study, data and also contrary to the recommendations of its own Task Force, arbitrarily created Ordinance 28 that contains four zones with arbitrary numbers of STR Licenses within each zone for a total of 2,200 STR licenses.

84. The recitals contained in Ordinance 28 offer several justifications, including "a continued dramatic increase in the number of accommodation unit licenses issued by the Town,"

85. Ordinance 28 (2022) created four zones which allowed for discrete numbers of STR Licenses, totaling 2,200:

> Zone 1 – Tourism Zone (Maximum of 1,680 STR Licenses)
>
> Zone 2 – Downtown Core Zone (Maximum of 130 STR Licenses)
>
> Zone 3 – Areas not categorized as a resort property and outside Zones 1 & 2 (Maximum of 390 STR Licenses)
>
> Resort Zone – Resort Property Zone (Unlimited exempt licenses)

86. This Ordinance also further defined how STR Licenses are not transferrable. Breckenridge Town Code § 4-6-8.

87. Ordinance 28 did not address the issues raised by the Task Force or Town staff, including without limitation: (i) whether there would be a need for an ability to have some new STR licensing opportunities in each of the zones; (ii) whether the Town-wide fixed cap of 2,200 STR Licenses was too restrictive and should be increased; (iii) whether already entitled developments and other new construction should have an additional allowance for STR Licenses and what numbers to use to accommodate such an allowance.

**EXHIBIT A-1**

**FIRST CLAIM FOR RELIEF**

**ORDINANCES 29 (2021) AND 28 (2022) ARE FACIALLY INVALID**

**AS PREEMPTED BY C.R.S. § 38-12-301**

88. Plaintiff restates the foregoing allegations as though fully set forth herein.

89. Colorado law provides: "The general assembly finds and declares that the imposition of rent control on private residential housing units is a matter of statewide concern; therefore, no county or municipality may enact any ordinance or resolution that would control rent on either private residential property or a private residential housing unit." C.R.S. § 38-12-301(1).

90. The Town of Breckenridge Ordinances 29 (2021) and 28 (2022), and codification thereof, are facially invalid because each is an imposition of rent control on private residential property.

91. Although the Ordinances have the laudable purpose of increasing the supply and affordability of workforce housing within the Town, the Ordinances nevertheless violate the plain language of the Colorado's statutory prohibition of rent control.

92. The Ordinances are facially invalid as their design, purpose and intent is to control and stymie the rental market supply and prices within the Town through a series of legislative actions, including:

   a. significantly reducing and capping the number of properties in the Town that may receive a STR License (Ordinance 29),

   b. creating a large area of the Town where STR use is extremely limited (Ordinance 28),

   c. creating STR zones with individual STR license caps within each zone (Ordinance 28),

   d. removing previously eligible properties out of STR eligibility for more than thirty (30) years.

93. The Ordinances create a disparity in the rental market between neighbors similarly situated. For example, a property owner who currently holds a STR License may rent his property to a short-term renter at a higher rate than his neighbor in the same subdivision who either

**EXHIBIT A-1**

does not hold a STR License or is on the waiting list to receive a STR Licens,e and whose only market is a long-term renter paying reduced long term rental rates. The evidence will show there is significant disparity between the rental rate of these two types of rental markets.

94. The Ordinances' purpose is to impermissibly reallocate private residential housing away from short term rental uses and to increase the supply and affordability of long-term workforce housing.

95. Put simply, the intended purpose of the Ordinances is to lower the supply of short-term rentals in the Town in an attempt to increase the supply of long-term rentals and in so doing, lowering the rental rate for long-term rentals.

96. The blatant effect of the Ordinances is to create a legislatively imposed suppression of the rental market rate residential property owners may receive where such owner does not possess (and is unable to obtain) a STR License.

97. The Colorado Supreme Court held in *Telluride v. Thirty-Four Venture, LLC*, 3 P3d 30 (Colo. 2000) that the Colorado Rent Control Law, C.R.S. § 38-12-301, does not define what qualifies as rent control, nor is it a term of art and "the broad language of the statute plainly encompasses any mandate that would operate to control rents." *Id.* at 35.

98. The Ordinances impermissibly restrict the ability of owners of private residential housing within the Town to rent their property at market rates. As the *Town of Telluride* Court held, rent control statutes come in all types, shapes and sizes and that every rent control statute has only one raison d'etre, to ensure that the landlord's rent is kept below the fair market rental of the property. *Id*. (quoting Epstein at 7470),  The stated purpose of Ordinances 29 and 28.

99. These Ordinances violate Colorado's existing statutory prohibition of rent control and are contrary to the public policy of the State of Colorado. *Town of Telluride v. Lot Thirty-Four Venture, L.L.C.,* 3 P.3d 30, 37–38 (Colo. 2000), *as modified on denial of reh'g* (Feb. 26, 2000) ("If the home rule action conflicts with the state legislature's action, however, the state statute supersedes the home rule authority…. Although economic conditions may vary

**EXHIBIT A-1**

in housing markets across the state, the legislature has seen fit to enact a uniform ban on rent control as a matter of public policy.")

100. Since the effective date of the Ordinances, Plaintiff's members include individuals who do not possess a STR License and may not be granted one and are, therefore, relegated to a waiting list. The Town has publicly stated that the wait time for a property on the STR License waitlist in Zone 2 is approximately 5-10 years while for those in Zone 3 the wait period is estimated to be 30 or more years.

<strong>Extraterritorial Impact</strong>

101. An "extraterritorial impact" occurs when a municipality's ordinance adversely impacts state residents outside the municipality. *Telluride v. Lot Thirty-Four Venture, LLC*, 3 P3d @ 38-39 (Colo. 2000).

102. Stated differently, an extraterritorial impact is the ripple effect that a municipality's ordinance or regulation creates on state residents outside the municipality's boundaries. Id. @ 38-39.

103. Ordinance 29 decreases the number of residential properties available in the Town that may be used for short-term rental purposes. This has resulted in a geographical shift in the STR market from Breckenridge to increase in neighboring communities.

104. Restricting the operation of the free market with respect to housing in one area may cause housing investment and population to migrate to other communities already facing their own growth problems. Id. @ 39.

105. On information and belief, after the Town of Breckenridge capped the number of STR Licenses under Ordinance 29, there has been a ripple effect in the region surrounding the Town. This ripple effect, or extraterritorial impact, is evident in two forms. First, the market value of residential properties increased significantly in the communities that are adjacent to Breckenridge that did not have a short-term license moratorium or cap that was met. The increase was felt immediately in these communities as a result of buyers seeking to purchase residential properties for short-term use in Breckenridge could no longer find them, were now forced to purchase in the adjoining communities. This increase in demand in the surrounding communities resulted in escalated prices in the values of these properties

<strong>EXHIBIT A-1</strong>

which in-turn has driven up the value (and property taxes) of all residential properties in the affected communities. Second, the ripple effect shifted the negative impacts associated with STRs, as voiced by the Breckenridge Council, to the neighboring communities that do not have the financial resources, and in some cases infrastructure, to handle them.  For example, in one neighboring community the surge in real property purchases being used for STR purposes has resulted in  increased traffic congestion, parking issues and additional noise and trash complaints.

106. On May 24, 2022, during the Summit County Board of Commissioners public hearing county staff presented an update on short term rentals within the county. In its presentation, staff stated "[short-term rental] regulations from other jurisdictions in Summit County can impact the growth in short-term rentals outside of that jurisdiction."

107. A local ordinance that creates extraterritorial impact, especially if they are negative impacts, is a matter of statewide concern and interest and any such local ordinance or regulation creating such impact can be invalidated as preempted by state law.

108. The evidence will show that Ordinance 29 created a negative extraterritorial impact on a number of surrounding communities, is in violation with the greater state interest established by Colorado's statutory rent control prohibition and, therefore, must be invalidated.

109. The net effect of the Ordinances is to impermissibly control rents of private residential housing units within the Town, a violation of C.R.S. § 38-12-301(1) and they must be invalidated.

## SECOND CLAIM FOR RELIEF

### ORDINANCE 29 (2021) VIOLATES

### PLAINTIFF'S SUBSTANTIVE DUE PROCESS RIGHTS

110. Plaintiff restates the foregoing paragraphs as through set forth fully herein.

111. Colo. Const. art. II, § 25 prohibits state actors from depriving individuals of life, liberty, or property without due process of law.

112. On or about September 29, 2021, the Town Council for the Town adopted Ordinance 29.

113. Ordinance 29 capped the number of STR Licenses at 2,200.

**EXHIBIT A-1**

114. The stated purpose of Ordinance 29, inter alia, is to favorably alter the supply of long-term employee housing at the expense of restricting the rights and ability homeowners to rent their homes as short-term rentals. (Ordinance 29, Section 1 (D) & (Q)).

115. The evidence will show that town council arbitrarily predetermined a cap of 2,200 STR Licenses at the onset of discussions about how it would meet local employee housing needs.

116. The evidence will also show that the Town did not rely on or base its decision to cap STR Licenses at 2,200 on any relevant study or analytical data supporting the license cap.

117. Defendant's actions in the passage of the Ordinances was irrational, arbitrary and capricious and not rationally related to a proper legislative purpose.

118. Under Colorado law, local legislation may be overturned if it is "unreasonable, arbitrary, and capricious, or if it does not bear a rational relation to a proper legislative objective. *Town of Dillon v. Yacht Club Condos. Home Owners Ass'n*, 325 P3d 1032, 1039 (Colo. 2014).

119. A zoning ordinance that is not in furtherance of its stated purpose may be invalidated. *City of Englewood v. Apostolic Christian Church*, 362 P.2d 172,175 (1961)

120. There is no rational relationship between the arbitrary and predetermined cap of 2,200 STR Licenses adopted by the Town in Ordinance 29, and it's stated purpose of providing sufficient local long term employee housing, or that the cap number will improve the character of the Town, or change the operation of "some" Accommodation Units. In any event, suppressing rental rates for workforce housing is not a legitimate legislative purpose.

121. The STR License cap set forth in Ordinance 29 is random and represents an arbitrary number that is not supported by and study or statistical data and not related to a proper legislative purpose, therefore, violates COPR and its members' rights to substantive due process. Consequently, Ordinance 29 is facially unconstitutional.

122. COPR is entitled to the declaratory and injunctive relief requested in Plaintiff's Prayer for Relief.

**EXHIBIT A-1**

## **THIRD CLAIM FOR RELIEF**

### **ORDINANCE 28 (2022) VIOLATES**

### **PLAINTIFF'S SUBSTANTIVE DUE PROCESS RIGHTS**

123. Plaintiff restates the foregoing paragraphs as if set forth fully herein.

124. Ordinance 28 was adopted on August 23, 2022, and is now codified as Town Code §4-6-4.

125. In part, Ordinance 28 created a zoning map for STR use (STR Zone Map). The STR Zone Map consists of four zones. These zones are identified as: zone 1-Tourism, zone 2-Downtown Core, zone 3- areas not categorized as a resort property nor included in zones 1 or 2, and Resort property Zone., Ordinance 28 also establishes limits on the number of STR licenses that may exist within each of the described zones. (Town Code 4-6-4)

126. Under Colorado law a restriction on the use of property must be reasonable not arbitrary and bear a rational relationship to a permissible state objective. *Rademan v. City and County of Denver*, 526 P. 2d 1325 (Colo. 1974).

127. Exactly in the same manner as the Town dismissed the recommendations of local business organizations in refusing to conduct or analyze a study or meaningful data that would rationally lead their decision-making process in the passage of Ordinance 29, here, the Town adopted Ordinance 28 after declining to permit representatives of its Task Force to present their findings, opinions and recommendations as they were originally commissioned to perform.

128. Specifically, the Town failed to conduct any objective study or review any analytical data that would meaningfully assist them in determining whether STR zones were necessary, where and how the STR zone boundaries should be located, how many licenses should be appropriated to each zone, and how any of this will achieve Ordinance 28's intended purpose of providing local employee housing.

129. Instead, the Town once again, irrationally imposed a predetermined and arbitrary policy by using antiquated and inapplicable planning documents (LUD and LUGs) that were not developed for the purpose of determining whether a neighborhood was to be utilized for STR uses.

**EXHIBIT A-1**

130. The process of using select terms and phrases contained in the description of a LUD and not contained in other similarly situated subdivisions, was clearly calculated to achieve the intended goal of deciding "who was in and who was out" and bears no rational relationship to the goal of increasing the availability of affordable housing for employees or determining where STR licenses should be issued.

131. The evidence will show that by using the LUDs and LUGs for this purpose and carving out similar terms and phrases in LUGs, was nothing more than developing support after-the-fact for a predetermined policy.

132. The result of Ordinance 28 is that subdivisions with similarly situated properties are now located  in two different zones whereby neighbors within the same subdivision or development are being treated differently as Ordinance 28 applies to their eligibility of receiving a STR License.

133. For example, one neighbor is located within Zone 1 (immediately entitled to a STR License) while his neighbor in the same subdivision is in zone 3 (is expected to wait thirty (30) or more years for a STR License).

134. Similarly, subdivisions that paid during the development phase to have close proximity to ski access, and in some cases paid for the placement of a chair lift to increase the subdivision's appeal to tourists and other lodging guests, were ignored and unaccounted for through the Town's arbitrary and irrational process of creating the STR Zones.

135. A zoning ordinance that is not in furtherance of its stated purpose may be invalidated. *City of Englewood v. Apostolic Christian Church*, 146 Colo. 374,380,362 P.2d 172,175 (1961).

136. The stated purpose of Ordinance 28 is to create "the availability of long-term residential areas and rentals [which would] contribute to creating quality living and working conditions for the local workforce". (Council Bill No. 28, Series 2022, p. 1)

137. There is no rational relationship between the defined STR zones created by the Town in Ordinance 28, the corresponding eligible STR Licenses for each zone and the stated purpose of creating quality living and working conditions for the local workforce. The evidence will show that the Town Council arbitrarily predetermined where it wished there to be fewer or no STR Licenses, failed to conduct and independent study or review relevant

**EXHIBIT A-1**

data when carving up the Town to create the STR Zones and accompanying STR License caps. Further, the Town rejected the closest thing it had to an independent analysis and recommendation when declined to hear the full views of its Task Force.

138. Defendant's actions are arbitrary and capricious and not rationally related to a proper legislative objective.

139. For these reasons, the Ordinances violate the equal protection rights of Plaintiff's members and those similarly situated.

**FOURTH CLAIM FOR RELIEF**

**ORDINANCES 29 (2021) AND 28 (2022) VIOLATES EQUAL PROTECTION UNDER THE UNITED STATES CONSTITUTION AND COLORADO CONSTITUTION**

140. Plaintiff restates the foregoing paragraphs as if set forth fully herein.

141. Both the United States Constitution and the Colorado Constitution require equal protection of laws. U.S. Const. amend. XIV, § 1; Colo. Const. art. II, § 25.

142. Equal protection of the laws requires that governments like the Town to accord similar treatment to all persons who are similarly situated. *Mayo v. National Farmers Union Property and Cas. Co*, 833 P.2d 54, 57 (Colo. 1992).

143. As stated above, the Town Ordinance No. 29 (2021) establishing fixed Town-wide cap restricting STR Licenses for the purpose, inter alia, of ensuring adequate supply of workforce housing, including long term rental housing.

144. As stated above, the Town Ordinance No. 28 (2022) establishing zones for STR Licenses and restricting the number of STR Licenses in each zone seeks, inter alia, to increase the availability and supply of long-term residential rentals within the Town.

145. As stated above, the four zones were subjectively and arbitrarily created by the Town.

146. As set forth herein, as of the filing of this complaint, the Town contends that:

    a. Zone 1 allows 1620 STR licenses

    b. Zone 2 allows 130 STR licenses with no licenses currently available

    c. Zone 3 allows 390 STR licenses with no licenses currently available

    d. Resort Properties Zone allows 1780 STR licenses

147. The Ordinances treat similarly situated owners of real property within the Town differently.

**EXHIBIT A-1**

148. For example, an owner of residential property now located within Zone 2 or Zone 3, is ineligible to rent out his or her property as a short-term rental or otherwise collect rents from short term tenants or guests in his or her property.

149. According to the Town, it may be 5 to 10 years before the first owner on the Town's STR waitlist located within Zone 2 becomes eligible for a STR license, and 30 years for the first person on the STR waitlist for Zone 3 to become eligible.

150. By contrast, an owner of residential property within the Resort Zone or Zone 1 may obtain a license by simple application.

151. Members of Plaintiff who own residential property in Zone 2 or Zone 3 wanting a STR License, are treated differently than members of Plaintiff who happen to own residential property in Zone 1 or the Resort Zone.

152. Another example of the disparity treatment created by Ordinance 28 (2022) is that the zones created by the Town divide properties of the same subdivision into two different zones. Although similarly situated, the neighbors are treated different. One property is in Zone 2 and their neighbor is in Zone 3. As previously stated, the time for the neighbor in zone 2 will exceed 5 years before becoming eligible for a STR License, where their next-door neighbor in Zone 3 must wait thirty (30) or more years before becoming eligible.

153. The differential treatment of Plaintiff's members is not related to any legitimate governmental interest.

154. For these reasons, the Ordinances violate the equal protection rights of Plaintiff's members and those similarly situated.

155. Plaintiff's members and others similarly situated are to a declaratory and injunctive relief.

## FIFTH CLAIM FOR RELIEF
## ORDINANCES 29 (2021) AND 28 (2022) VIOLATES THE DORMANT COMMERCE CLAUSE U.S. CONST. art I, § 8, cl. 3.

156. Plaintiff restates the foregoing paragraphs as if set forth fully herein.

157. Ordinances 29 and 28 discriminate and impose undue burdens on interstate commerce and are presumptively invalid.

158. STRs are very commonly rented by out-of-state visitors.

159. Long-term rentals are primarily rented by Colorado residents.

**EXHIBIT A-1**

160. The purpose of the Ordinances is to benefit Colorado residents by decreasing the cost of their rental housing to the detriment of out-of-state visitors.

161. To accomplish this purpose, the Ordinances lowers the supply of short-term rentals in its attempt to increase the supply of long-term rentals.

162. The Ordinances' intended effect is to lower the average long-term rental rate, but would also have the effect of increasing the average short-term rental rate.

163. The Ordinances discriminate against interstate commerce on their face, purpose, and in their effect and are presumptively invalid.

164. For these reasons, the Ordinances violate the Dormant Commerce Clause.

165. Plaintiff's members and others similarly situated are to a declaratory and injunctive relief.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in its favor and against Defendant, and to order the following relief:

(i)   A declaration that Ordinance 29, including the Section 8 setting a STR License Town-wide fixed cap of 2,200 licenses and prohibition against STR License transfer, is preempted by C.R.S. § 38-12-301 rendering it void and unenforceable;

(ii)   A declaration that Ordinance 29, including the STR License Town-wide fixed cap of 2,200 licenses and prohibition against STR License transfer, is unconstitutional and, therefore, void and enjoined from enforcement;

(iii)   A declaration that Ordinance 28, including the arbitrarily drawn zones and cap imposed on each zone, is unconstitutional and, therefore, void and enjoined from enforcement;

(iv)   An award of attorney fees and costs pursuant to applicable law;

(v)   Any other relief that this Court deems just and proper.

**EXHIBIT A-1**

Dated:  October 31, 2023.


KNAPP & ASSOCIATES, LLC            FRASCONA,   JOINER,   GOODMAN   AND
                                   GREENSTEIN, P.C.


_/s/ Timothy J. Knapp_             _/s/ Jordan C. May_
Timony J. Knapp, #18867            Jordan C. May, #38734
11747 W. 54th Pl.                  Ryan P. Horace, #53091
Arvada, CO 80002                   4750 Table Mesa Drive
720-333-2222                       Boulder, CO  80305-5541
_Attorneys for Plaintiff_          (303) 494-3000
                                   _Attorneys for Plaintiff_


Plaintiff's Address:
101 Main Street, C101
Frisco, CO 80443


**EXHIBIT A-1**